SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Appellant,

v.

James W. WALTERS, Appellee.

Court of Appeals of Kentucky.

Jan. 20, 1967.

Rehearing Denied May 5, 1967.

Carl L. Wedekind, Jr., Stites, Peabody & Helm, Louisville, for appellant.

Benjamin Mazin, Louisville, for appellee.

R. C. TARTAR, Special Commissioner.

The plaintiff, James W. Walters, obtained a judgment in the sum of $6,182.25 against the defendants, Southern Bell Telephone and Telegraph Company and Margaret L. Gray, in a trial before a jury. The defendant Southern Bell appeals. Mrs. Gray has not appealed.

The complaint alleged that while an invitee in the place of business of Margaret L. Gray, known as Sportsman's Bar, plaintiff was caused to and did trip over a metal strip which had been installed and maintained by the defendant Southern Bell; that said metal strip which had been screwed to the floor had become unsafe and danger-ous; that the screws had worked their way out, and the strip had become loose and unfastened; and that, due to the negligence of the defendants individually, jointly and concurrently, in maintaining the strip of metal in such dangerous and defective condition, he was caused to trip over same, and was thereby injured, for which he sought damages, including recovery of medical and hospital bills and wages alleged to have been lost.

The defendant Southern Bell pleaded among other things that at the time and place of his injury the plaintiff was himself guilty of negligence, and that his own negligence contributed to cause and bring about his injuries, if any.

At the conclusion of all the evidence Southern Bell's motion for a directed verdict was overruled. After judgment had been entered Southern Bell moved for a judgment notwithstanding the verdict, and this motion also was overruled.

The arrangement of the Sportsman's Bar, so far as material here, was similar to other bars providing both food and drink. There was a front or service bar at which patrons were served standing, and a back bar parallel to it along the south wall of the interior, used mainly for the display and storage of wares dispensed over the service bar. The two bars were some 25 or more feet long, and there was a concrete walkway between them, about 3 feet wide, for the use of bartenders and other service personnel. At the front a flap or panel connected the two bars, which lifted up on hinges to provide passage into the walkway and inner bar area.

Also at the front, a pay telephone rested on a swivel on the corner of the service bar. The telephone wire entered the building through the south wall, crossed the floor and walkway area near the front of the two bars, and then ran up the side of the service bar to the telephone connection. In crossing the floor and walkway the wire was encased in a metal molding or floor duct, the bottom strip of which was secured to the floor by screws set in lead

anchors, and the top strip was fastened over the bottom with snaps. The center of the top strip was from three-eighths to one-half inch above the surface of the concrete floor, and for safety the sides of this strip were beveled or slanted downward from the center to their connection with the bottom or floor strip. The inner walkway between the two bars was partially covered by rubber mats running from near the metal molding to the rear of the bars.

Margaret L. Gray had owned the Sportsman's Bar for five years. The pay station and the metal molding encasing the wires as they crossed the floor and walkway were there when she took possession and had remained there. The metal molding was in plain view, visible to all who used the walkway.

The accident in suit occurred about 1:00 A.M. on April 15, 1964. Walters had entered the bar some minutes earlier. He was on familiar ground. The owner of the bar, Margaret L. Gray, was his mother-in-law, and his stepfather-in-law, Lee Gray, was its manager. Walters was having a cup of coffee at the service bar when Gray asked him to take some currency from the cash register to the Franklin Liquor Store a short distance away and exchange it for silver to meet the morning trade. Walters said he would do this.

To obtain the currency Walters walked to the front of the two bars, through the flap, over the metal molding, and down the walkway to the cash register which stood on the back bar about half way down the walkway. He took $40 in bills from the cash register, and his testimony is that while retracing his steps along the walkway toward the front of the bar his foot went under the metal molding, causing him to fall and sustain injuries.

It is uncontradicted that the metal molding had deteriorated from rust, that the screws holding the bottom strip to the floor had rusted away and were loose, and that this condition had existed for some time. Lee Gray testified that he had notified Southern Bell of this fact and asked that the strip be repaired or replaced.

At the time of his fall Walters was an invitee on the premises. It is undisputed that the telephone equipment in the bar, including the strip and wire it protected, were the property of Southern Bell and that Southern Bell had pre-empted the small space on the floor of the walkway between the service bars occupied by the metal strip.

It was the duty of Southern Bell to keep the metal strip or molding in reasonable repair, and in a reasonably safe condition, and it owed this duty to all persons having proper business to use the walkway including Walters, in this instance, but Southern Bell was not the insurer of the safety of such persons. Branham's Adm'r v. Buckley, 158 Ky. 848, 166 S.W. 618; Bridgford v. Stewart Dry Goods Co., 191 Ky. 557, 231 S.W. 22; J. C. Penney Co. v. Mayes, Ky., 255 S.W.2d 639.

It is also the law in this jurisdiction that an invitee's right to assume that the premises which he has been invited to use are reasonably safe does not relieve him of the duty to exercise ordinary care for his own safety, nor license him to walk blindly and nonchalantly into dangers and obstacles which are obvious, plainly to be seen by him and entirely visible, or which are known to him, or would be anticipated by any person of ordinary prudence. Lyle v. Megerle, 270 Ky. 227, 109 S.W.2d 598; J. C. Penney Co. v. Mayes, Ky., 255 S.W.2d 639.

As stated, Walters was on familiar ground at the time and place of the accident. His own testimony is that he was not only a frequent visitor at the bar, but a member of the family that owned and operated it. More than this, he had worked there as a bartender two years before, and from time to time since then he had "filled in" for his stepfather-in-law at the bar and had performed other occasional jobs for him.

For five years he had known the Sportsman's Bar as an employee, handyman, relative and visitor.

Walters' own testimony is that he was familiar with the metal molding enclosing the telephone wires, had seen it many times, knew exactly where it was, and had walked over it many times. On his way to the cash register that night he had walked over it without difficulty. And he knew, although he testified that he had forgotten it, that the metal molding was loose, and in a defective condition. Lee Gray had told him about it a month before the accident.

At the time and place of his injury, did Walters exercise ordinary care for his own safety? Did he keep the proper lookout to discover and avoid dangers and obstacles in his path, plainly visible and obvious, and known by him to be on the walkway, or that would be anticipated by any person of ordinary prudence?

We will let the further testimony of Walters answer this question.

Q– "How high is this metal strip on the floor, how—"

A– "Well, (interrupting) normally it is—it is just a thin metal strip, that covers the wire that—screws to the floor. As far as I know of."

Q– "Well could you tell me about how high it extends above the floor?"

A– "Well it—normally it stands say maybe a quarter of an inch. Something like that."

Q– "Now on this particular occasion was it more than a quarter of an inch?"

A– "I don't know. Couldn't tell you, I didn't—"

Q– (Interrupting) "Sir?"

A– "I couldn't tell you, because I don't know. I wasn't looking. If I was looking I might not have tripped over it."

Q– "All right, sir. Now as you went behind the bar the first time (to the cash register) it was necessary for you to walk in the area where the floor duct was, is that correct?"

A– "That's right."

Q– "All right did you have any difficulty in walking over it?"

A– "No."

Q– "All right. Now as you returned from the cash register heading toward the floor duct and towards the outside of the bar I will ask you whether or not you looked down in the direction in which you were walking on the floor?"

A– "I didn't look at my feet."

Q– "You did not?"

A– "I don't look down when I walk."

Q– "Did you on this occasion look in the vicinity in front of you down where you were going to walk?"

A– "I was looking straight ahead."

Q– "Is the answer to my question then no, you did not?"

A– "I answered the question. I was looking straight ahead."

Q– "Did you look at the floor ahead of you where you were going to walk?"

A– "No."

\* \* \* \* \* \*

Q– "Were there any obstructions to keep you, or to keep anyone from seeing that floor duct, when they were standing behind the bar, and walking in the general area that you were walking from the cash register out from behind the bar?"

A– "In other words, where you couldn't see it, no, sir."

Q– "Your answer was: 'No, sir'?"

A– "That's right, I don't know."

Q– "There are none that you know of are there?"

A– "No, sir."

We find striking analogies in fact and in legal principles with the case at bar, in the cases of J. C. Penney Co. v. Mayes, Ky., 255 S.W.2d 639; Humbert v. Audubon Country Club, Ky., 313 S.W.2d 405; and O. K. Tire Store v. Stovall, Ky., 392 S.W.2d 43. The decision here clearly falls within the compass of the law stressed by the court in those opinions.

In the J. C. Penney case the plaintiff tripped over a step-down from a sidewalk to the vestibule of the store. She admitted that she was looking at a boy in the store window instead of looking where she was walking. The court held that she was contributorily negligent as a matter of law on the following grounds:

"An invitee's right to assume that premises which he has been invited to use are reasonably safe does not relieve him of the duty to exercise ordinary care for his own safety nor license him to walk blindly into dangers which are obvious, known to him, or that would be anticipated by one of ordinary prudence. Lachat v. Lutz, 94 Ky. 287, 22 S.W. 218, 15 Ky.Law Rep. 75, and Lyle v. Megerle, 270 Ky. 227, 109 S.W.2d 598.

"Appellee testified that she walked toward the step-down in broad daylight and that her eyes were riveted on a boy who was picking up something in a show window at the time she fell. She confessed she could have seen the step if she had been looking down at the time. It appears that appellee's accident resulted from her own conceded negligence; therefore, the company is not legally responsible for injuries she brought upon herself by her lack of ordinary care for her safety. There is no justification for her failure to watch her step because her gaze was irresistibly drawn to movements in the show window, as counsel seem to imply in their brief. To uphold this theory would make the company liable as an insurer and not because of negligence. Cates v. Evans, Mo.App., 142 S.W.2d 654." 255 S.W.2d at p. 643.

The Humbert case parallels the case at bar both in substantial details and in applicable legal principles. Humbert, on a visit to the Audubon Club, of which he was a member, slipped and fell in an aisle from which the usual rubber runner had been temporarily removed. He had walked over the same area only a short time before. The court in sustaining the trial court's direction of a verdict for the defendant said:

"Dr. Humbert's testimony shows that he was paying no attention at all to his footing. According to his testimony, if he had looked down at the floor upon which he was walking, he could have well observed not only the changed position of the runner but also the slick condition of the floor. He testified that he fell as he started to make the right turn to go into the vestibule. What was he doing when he started to make the turn? The following testimony answers the question:

Q– "What were you looking at as you turned the corner?"

A– "Looking straight ahead." 313 S.W.2d at p. 407.

In the O. K. Tire Store case the plaintiff stepped backward into a bucket of lye and was burned. The court held that he was contributorily negligent and could not recover. After quoting with approval from the J. C. Penney case the opinion states:

"Under the testimony in this case the only negligence shown by the undisputed facts is that of the appellee in stepping backward into a hazard which he should have seen. A five-gallon bucket is a sizable article that would require some high stepping in order to put one's foot into it. As was pointed out in Allen v. Dillman, Ky., 249 S.W.2d 23, 'The duty to make reasonable use of faculties to observe and discover conditions of danger is included within the duty to exercise ordinary care to avoid injury.' To the same effect see Price v. T. P. Taylor Co.,

302 Ky. 736, 196 S.W.2d 312; Humbert v. Audubon Country Club, Ky., 313 S.W. 2d 405; and Leslie Four Coal Co. v. Simpson, Ky., 333 S.W.2d 498, 84 A.L.R. 2d 728." 392 S.W.2d at pp. 44–45.

Walters relies on Winn-Dixie Louisville, Inc. v. Smith, Ky., 372 S.W.2d 789. In that case plaintiff stepped into a cardboard box, which according to her testimony was hidden from view. She also testified that she did not see the cardboard box until after she fell. There was no suggestion that she had any reason to anticipate its presence. We quote from the opinion:

"We are not convinced that the evidence in this case showed without substantial doubt that appellee could have seen the cardboard box in the position it was located as she pushed the cart down the aisle of appellant's store to the position where she removed the produce from the cart and handed it to appellant's employee." 372 S.W.2d at p. 792.

There are plain distinctions between the facts in the case at bar and those in Winn-Dixie. As we have seen, Walters' own testimony is that he knew the metal strip or molding was there, that he knew exactly where it was; and that he had been told it had become loose and that there was nothing to keep him from seeing it if he had looked.

█ It is manifest from this record that at the time and place of his injury Walters failed to use ordinary care for his own safety, and that his own negligence so contributed to his injury as to preclude recovery from Southern Bell.

Therefore we conclude that the trial court erred in overruling Southern Bell's motions for a directed verdict and for a judgment non obstante veredicto.

The cause is reversed with directions that a judgment be entered dismissing the action as to Southern Bell.